**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

CATHLEEN CARMODY,

      Plaintiff,

v.

SHERIFF MIKE ENSMINGER, in his individual and official capacities;
UNDERSHERIFF STANLEY BISHOP, in his individual capacity;
CORPORAL FRANK SCOFIELD, in his individual capacity;
DEPUTY ERIC VOIGT, in his individual capacity;
CORRECTIONAL HEALTHCARE MANAGEMENT, INC.;
CORRECTIONAL HEALTHCARE COMPANIES, INC.;
CORRECT CARE SOLUTIONS, LLC; and
NURSE SUE L/N/U in her individual capacity,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff, Cathleen Carmody, by and through her attorneys, David Lane and Liana Orshan

of KILLMER, LANE & NEWMAN, LLP, hereby brings this Complaint and Jury Demand and alleges

as follows:

**INTRODUCTION**

      1.    While a pretrial detainee at Teller County Detention Center ("Jail"), sixty-five-

year-old Cathleen Carmody suffered a painful and debilitating back injury when she fell after

losing her balance.

      2.    Ms. Carmody had recently undergone hip replacement surgery. After the surgery,

her doctor directed her to use a walker until she no longer needed it for walking or balance.

      3.    Yet with blatant disregard for Ms. Carmody's obvious inability to walk unaided,

Teller County Sheriff's officers took away Ms. Carmody's walker when she arrived at the Jail. Because she did not have her walker, Ms. Carmody lost her balance several days later and fell onto her back.

4.      After she fell, Ms. Carmody told a deputy and a nurse that she needed an ambulance because she could not move and was in extreme pain. The nurse responded, "We don't do that here," and they pulled her off the floor and took her back to her room. No examination was conducted nor any adequate treatment provided for the approximately ten additional days that Ms. Carmody spent in the Jail, during which she was in constant, severe pain.

5.      Because of Defendants' unconstitutional and unlawful acts and omissions, Ms. Carmody now has to endure chronic and severe back pain that detrimentally affects all aspects of her life.

## JURISDICTION AND VENUE

6.      This action arises under the Constitution and laws of the United States.

7.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

8.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## PARTIES

**Plaintiff**:

9.      At all times relevant to the subject matter of this Complaint, Plaintiff Cathleen Carmody was a citizen of the United States and a resident of Colorado.

10.     At all relevant times, Ms. Carmody was a disabled individual within the meaning of the Americans with Disabilities Act of 1990, as amended ("ADA").

11.     Ms. Carmody is no longer in detention; therefore, no administrative or other exhaustion requirements apply to any of the legal claims asserted herein.

**Defendants**:

12.     Teller County is a governmental entity organized under the laws of the State of Colorado. Among other things, Teller County maintains the Jail, located at 288 County Road 29 in Divide, Colorado. Teller County Sheriff's Office ("Sheriff's Office") is an agency of Teller County. The Sheriff's Office operates and manages the Jail.

13.     At all times relevant to the subject matter of this Complaint, Defendant Sheriff Mike Ensminger was by law—under Colorado Revised Statutes section 30-10-511—in charge of the Jail and the supervision of all Jail employees and inmates, and acting within the scope of his employment and pursuant to his official duties. He therefore was a person acting under the color of state law within the meaning of 42 U.S.C. § 1983. At all relevant times, Sheriff Ensminger was a citizen of the United States and a resident of Colorado.

14.     At all times relevant to the subject matter of this Complaint, Defendant Undersheriff Stanley Bishop was a citizen of the United States and a resident of Colorado. At all relevant times, Undersheriff Bishop was employed by the Sheriff's Office as the Acting Jail Administer, was in charge of overseeing the daily operations of the facility, and was acting within the scope of his employment and pursuant to his official duties. He therefore was a person acting under the color of state law within the meaning of 42 U.S.C. § 1983.

15.     At all times relevant to the subject matter of this Complaint, Defendant Corporal Frank Scofield was a citizen of the United States and a resident of Colorado. At all relevant

times, Corporal Scofield was employed by the Sheriff's Office as a corporal at the Jail and acting within the scope of his employment and pursuant to his official duties. He therefore was a person acting under the color of state law at within the meaning of 42 U.S.C. § 1983.

16.     At all times relevant to the subject matter of this Complaint, Defendant Deputy Eric Voigt was a citizen of the United States and a resident of Colorado. At all relevant times, Deputy Voigt was employed by Sheriff's Office as an officer at the Jail and acting within the scope of his employment and pursuant to his official duties. He therefore was a person acting under the color of state law within the meaning of 42 U.S.C. § 1983.

17.     At all times relevant to the subject matter of this Complaint, Defendant Correctional Healthcare Management, Inc. ("CHM") was a for-profit corporation doing business in the State of Colorado. CHM's principal street address in Colorado was 6200 South Syracuse Way, Suite 440, Greenwood Village, Colorado 80111.

18.     At all times relevant to the subject matter of this Complaint, Defendant Correctional Healthcare Companies, Inc. ("CHC") was a for-profit corporation doing business in the State of Colorado. CHC's principal street address in Colorado was 6200 S. Syracuse Way, Suite 400, Greenwood Village, Colorado 80111.

19.     At all times relevant to the subject matter of this Complaint, CHM and/or CHC contracted with Teller County to provide medical services to inmates at the Jail and supervised and implemented such care.

20.     Defendant Correct Care Solutions, LLC ("CCS") is a corporate medical care provider and a for-profit Tennessee corporation doing business in the State of Colorado, with its principal street address at 1283 Murfreesboro Road, Suite 500, Nashville, TN 37217. Its registered agent of service in Colorado is located at 3773 Cherry Creek North Drive #575,

Denver, CO 80209. Upon information and belief, CCS acquired or merged with Defendant CHC in 2014.

21.     Upon information and belief, Defendants CHM, CHC, and CCS are corporate medical care providers related to one another. They are collectively referred to as the "CCS Defendants."

22.     Teller County, by and through its elected Defendant Sheriff, is required to provide adequate medical care to inmates in the Jail. Upon information and belief, at all times relevant to the subject matter of this Complaint, Teller County had contracted with the CCS Defendants, a private party, to provide medical care to the inmates and supervise such care. By assuming a governmental function traditionally performed exclusively by the state, the CCS Defendants' conduct was fairly attributable to the state. The CCS Defendants therefore were persons acting under the color of state law within the meaning of 42 U.S.C. § 1983.

23.     Upon information and belief, at all times relevant to the subject matter of this Complaint, Defendant Sue L/N/U ("Nurse Sue") was a citizen of the United States and a resident of Colorado. Upon information and belief, at all relevant times, Nurse Sue was employed by the CCS Defendants and provided medical services to the inmates at the Jail. Because she performed a function traditionally reserved exclusively to the state, Nurse Sue's conduct was fairly attributable to the state. Nurse Sue therefore was a person acting under the color of state law within the meaning of 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

### *Ms. Carmody needed to use a walker after undergoing hip replacement surgery.*

24.     In 1999, Ms. Carmody injured her hip while working as a nurse. For the next fifteen years, she dealt with pain in her hip until she finally had total hip replacement surgery when she was sixty-three years old, in September 2014.

25.     In August 2014, Ms. Carmody's doctor directed her to obtain a walker and start using it a few weeks before the surgery. When Ms. Carmody was discharged from the hospital surgery, she was told to keep using the walker until she no longer needed it for walking or balance. Ms. Carmody used the walker until approximately January 2015.

### ***Despite Ms. Carmody's doctor's orders and her obvious inability to walk unaided, Jail officials took away her walker.***

26.     Ms. Carmody was arrested on October 23, 2014, for an alleged probation violation. Before going to jail, Ms. Carmody appeared in court, escorted by a deputy from the Sheriff's Office, for a status hearing on the motion for probation revocation. During that hearing, the court discussed the fact that Ms. Carmody had recently had surgery and noted that Ms. Carmody was using a walker, that she was "pretty medically fragile," and that it was obvious that she was "in some physical discomfort."

27.     Ms. Carmody was using her walker when she arrived at the Jail for processing on October 23. She was also holding onto a female deputy, who had escorted her from her court appearance to the Jail, for additional support while walking.

28.     After Ms. Carmody was processed, she was told to change her clothing. As she was going to do so, Corporal Scofield approached her and began to interrogate her about her walker, asking, "Where do you think you're going with that?" When Ms. Carmody responded that she was going to change, Corporal Scofield replied, "Not with that you're not."

29.     Ms. Carmody told Corporal Scofield that the judge had ordered that she could keep her walker. In response, Corporal Scofield said, "Well, the judge doesn't run this jail, the only people that do are me and the captain."

30.     Ms. Carmody replied, "Are you kidding?" She told Corporal Scofield, in the presence of two other deputies, that she did not know how she was "going to do this," meaning that she did not know how she could do without her walker.

31.     Completely ignoring her protests, Corporal Scofield took Ms. Carmody's walker away from her and told her that she was "going to have to do without [it]."

32.     At that point, Ms. Carmody was still holding on to the deputy for help walking. Despite Ms. Carmody's obvious inability to walk on her own, neither Corporal Scofield nor any of the other deputies present suggested any potential alternative to taking away her walker.

33.     For the entire duration of Ms. Carmody's time in jail (approximately fifteen days), she had the use of her walker only for visits with her attorney and court appearances. No other aid was ever provided (except that she was given a wheelchair instead of her walker for one visit with her attorney). It is unclear why Jail officials believed that she needed a walker or wheelchair to see her attorney or go to court but that did not need such an aid while at the Jail.

34.     Instead, in order to move around the Jail, Ms. Carmody was forced to hop on one leg. Because of the difficulty in doing so, she stayed in her room almost all the time. Other inmates knew that Ms. Carmody had difficulty walking and they brought her meals to her room.

35.     Although it was obvious that Ms. Carmody needed her walker or some other type of aid to be able to walk, none of the officers or employees at the Jail ever provided her with any such aid.

### *Because she did not have her walker, Ms. Carmody lost her balance and fell, suffering a painful back injury for which no examination or adequate treatment were ever provided.*

36.     On or about October 27, 2014, approximately four days after Ms. Carmody was arrested and deprived of the use of her walker, she decided to venture out of her room to see what was on television. Around 9:30 a.m., she hobbled into the dayroom, where another inmate was already watching television.

37.     Ms. Carmody attempted to sit down on a stool. But because she did not have her walker, she lost her balance. She fell backward off the stool and landed flat on her back.

38.     The other inmate in the dayroom became hysterical when she saw that Ms. Carmody could not move. The inmate pushed the button for the intercom, yelling, "Get a nurse, get an ambulance, get the fire department."

39.     A deputy, who upon information and belief likely was Defendant Deputy Voigt, and Nurse Sue responded to the call. Ms. Carmody told them that she was "having shooting pains" in her back, she "couldn't move," and she "needed an ambulance."

40.     Nurse Sue's answer to Ms. Carmody's plea for an ambulance was, "We don't do that here."

41.     Nurse Sue and the deputy pulled Ms. Carmody off the floor and took her back to her room. Ms. Carmody was never taken for any medical examination. Nurse Sue did not even perform a cursory examination.

42.     Neither Nurse Sue nor the deputy, nor any other employee at the Jail, provided Ms. Carmody with any medical treatment for her back, other than increasing the Tylenol she was taking for her hip from two times a day to three times a day—treatment which was patently unreasonable given the severe pain that she had.

43.     For the remaining time Ms. Carmody spent in jail, she was in constant, severe pain. She could barely move, and she stayed in bed. Even getting up to use the toilet, which was only a few feet away from the bed, caused her extreme pain.

44.     The other inmates would bring Ms. Carmody food and check on her. Despite Ms. Carmody's obvious pain and difficulty moving, none of the officers or employees at the Jail ever provided any medical care or treatment besides the increase in Tylenol.

### *The court ordered Ms. Carmody released because her medical needs were not being met by Jail officials.*

45.     On or about November 5, 2014, Ms. Carmody had a court appearance for which she was given her walker back. At the end of the hearing, the court spoke with Ms. Carmody's doctor from Colorado Springs. He told the court that Ms. Carmody should not be in jail given her medical needs, and he was very concerned about Ms. Carmody's fall in the jail.

46.     The court also expressed concern about Ms. Carmody's fall. The court stated that it was concerning that despite "the jail knowing about her medical history, [they] did not have her checked out or x-rayed at the hospital" after she fell.

47.     Based on the information from Ms. Carmody's doctor and the court's concern that Ms.  Carmody's health was at risk if she remained in custody, the court ordered that Ms. Carmody be released on a personal recognizance bond. Ms. Carmody was discharged from custody the following day.

### *Defendants' unconstitutional and unlawful actions have caused Ms. Carmody chronic severe pain that will last the rest of her life.*

48.     As soon as she was released from custody in November 2014, Ms. Carmody sought medical treatment for the back injury she had suffered from the fall. Initially, her medical

team ordered physical therapy (which was in addition to the physical therapy she had been receiving for her hip since her hip replacement surgery in September 2014).

49.     After a month of physical therapy, Ms. Carmody remained in severe back pain. Her doctor ordered an MRI, which showed extensive damage.

50.     In February 2015, about three-and-a-half months after being injured in the Jail, Ms. Carmody was still experiencing severe back pain. Her doctor ordered an epidural steroid injection to try to reduce the inflammation of her spinal nerves and alleviate some of the pain. The steroid injection helped reduce Ms. Carmody's back pain for a brief period of time.

51.     By the end of June 2015, the pain-relieving effects of steroid injection had worn off.  In July, Ms. Carmody received a second steroid injection to her spine. The procedure was very painful, and it was unsuccessful in alleviating her pain.

52.     After the unsuccessful steroid injection, Ms. Carmody needed to take morphine to obtain any relief from her pain.

53.     Because of the severity of the pain, Ms. Carmody explored surgical options. However, she was told that nothing, including surgery, could be done to repair the damage to her back. Her only option was pain management.

54.     Ms. Carmody now needs to take morphine every day to obtain any relief from her back pain. She would like to stop taking the morphine because of its side effects, but nothing else adequately alleviates her chronic and severe pain.

55.      If Ms. Carmody takes morphine, she can walk slowly and ride in a car or bus. Even with the morphine, however, she cannot do other things that she used to enjoy such as riding a motorcycle, horse, or bicycle.

56.     Ms. Carmody's daughter assists her every week with tasks like getting groceries, but she otherwise does not see anyone. Because of the pain, Ms. Carmody does not like to leave her house and cannot meet friends or visit with family. Even if people are willing to come see her at her house, she does not like to be around anyone because she is always in pain.

57.     Due to the constant, severe pain and the effect the pain has had on her life, Ms. Carmody is depressed all the time. Her daily life consists of trying to manage the pain or manage the side effects of the pain medication. She cannot sleep without pain medication but she hates the way the medication makes her feel. The fifteen days she spent in Teller County Detention Center at the end of 2014 have irreparably and permanently damaged not only her back but also her life.

### Defendants Teller County, Sheriff Ensminger, Undersheriff Bishop, and the CCS Defendants have a history of failing to provide adequate medical care to inmates at the Jail.

58.     For the past ten years, there has been a persistent and widespread practice by Jail officials and other individuals who work at the Jail of consciously withholding or failing to provide medications and other medical treatment to inmates at the Jail.

59.     For instance, in September 2014, Robert Vallina committed suicide after Jail officials failed to provide proper care and treatment for his known mental illness. The acts and omissions of Jail officials are currently the subject of a lawsuit brought by Mr. Vallina's family members against Teller County.

60.     According to Mr. Vallina's mother, when she asked if Mr. Vallina could take his antipsychotic medication, Jail officials told her "no." Inmates who were detained at the same time as Mr. Vallina said that immediately before he committed suicide, he was screaming for help but no assistance was ever provided. The lawsuit alleges that the other inmates alerted Jail

officials to the fact that Mr. Vallina needed help, but no one came to check on him until it was too late.

61.     In 2007 and 2008, two other lawsuits were filed by former inmates at the Jail, Alfredo Esquivel and Louis Sheptin, who alleged Jail officials denied them medical care and treatment. Esquivel was denied medication and not permitted to see a doctor for a dislocated shoulder. Sheptin was denied medication and emergency care; he later needed surgery for damage to his heart.

62.     Upon information and belief, Jail officials withheld needed medications and failed to provide medical attention to other former inmates who had known, serious medical conditions or incidents, including diabetes, kidney failure, and a stroke.

63.     Additionally, the CCS Defendants have a long history of failing to provide adequate medical care to inmates at other jails at which the CCS Defendants had or have contracts.

64.     For instance, in *McGill v. Correctional Healthcare Companies, Inc. et al.*, Case No. 1:13-cv-01080-RBJ-BNB (D. Colo.), a jury awarded Kenneth McGill approximately $11 million in his suit against the CCS Defendants for their deliberately indifferent failure to provide appropriate medical care in response to a stroke he suffered at the Jefferson County Detention Facility.

65.     Similarly, in *Turley v. Correctional Healthcare Management, Inc., et al.*, Case No. 1:10-cv-02772-REB-BNB (D. Colo.), Robert Turley experienced severe pain in his throat when a piece of a sandwich became lodged in his esophagus. He began coughing up blood and alerted the guards and medical personnel. The nurse who evaluated him simply gave him Tylenol and advised him that he would have to wait to see the physician. Mr. Turley became hypoxic and

unconscious, and had to be taken by ambulance to the hospital where he underwent emergency

surgery for an esophageal perforation. Mr. Turley now has significant medical issues as a result

of the CCS Defendants' mistreatment.

66.     In *Estate of Bruce R. Howard, et al. v. County of El Paso, Colorado et al*., Case

No. 1:10-cv-02740-CMA-MEH (D. Colo.), Bruce Howard died of a cardiac arrhythmia after

staff of the CCS Defendants denied him his heart medication after his arrest. During his brief

incarceration, Mr. Howard made repeated pleas to CCS medical staff for his heart medication

that were ignored. He received no treatment despite his visible shakiness and assertions that he

was hallucinating.

67.     These lawsuits are but a small sampling of cases in which the CCS Defendants

and related companies ignored obvious signs and symptoms of serious medical conditions and

denied inmates access to necessary medical care. Such deficiencies are the custom, practice, and

standard operating procedure of the CCS Defendants and their related entities.

68.     Various governmental institutions have repeatedly made extensive reports of

constitutional deficiencies in the care provided by CCS-related entities. These reports include

those by the National Commission on Correctional Health Care in 2007 and 2010, the

Department of Justice in 2008, and the United States Immigration and Customs Enforcement and

Homeland Security Office of Civil Rights and Civil Liberties in 2011.

69.     These incidents and reports show that Teller County (through its agent the

Sheriff's Office), Sheriff Ensminger, Undersheriff Bishop, and the CCS Defendants have a

pattern and practice of withholding and failing to provide medical care and treatment at the Jail

and elsewhere to inmates that have obvious and serious medical conditions. Because these

Defendants have implemented a custom of deliberate indifference and failed, despite the obvious

need to do so, to adequately train and supervise Jail officials in providing sufficient medical care and treatment, inmates at the Jail repeatedly have been subjected to violations of their constitutional rights. This custom was the reason Ms. Carmody fell and the moving force behind the painful and debilitating injury she suffered.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation –**
**Deliberate Indifference to Serious Medical Needs (Removal of Walker)**
**(Against the CCS Defendants, and Sheriff Ensminger, Undersheriff Bishop, and**
**Corporal Scofield in their individual capacities)**

70.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

71.    On October 23, 2014, Ms. Carmody was a pretrial detainee for purposes of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

72.    On October 23, Ms. Carmody had a serious medical need because her medical providers had directed that she use a walker after her hip replacement surgery and/or because her need to use the walker to walk and for balance was so obvious that even a lay person would have easily recognized such need.

73.    Taking away Ms. Carmody's walker posed a substantial risk of serious harm because it was highly probable that doing so would cause her to fall, and it was highly probable that if she did fall, as a sixty-three year old woman who had difficulty balancing and steadying herself, she would suffer a serious injury and experience substantial pain.

74.    The harm actually suffered by Ms. Carmody after she fell—a serious back injury that has caused her lifelong handicap and considerable pain—was substantial.

75.    When Corporal Scofield took away Ms. Carmody's walker on October 23, he knew that Ms. Carmody needed to use the walker to meet her serious medical needs because this

need was obvious to anybody with whom she had contact. Likewise, because the substantial risk of serious harm caused by taking away Ms. Carmody's walker was obvious, Corporal Scofield knew about this substantial risk.

76.     Corporal Scofield was therefore aware that a substantial risk of serious harm to Ms. Carmody would result if he took away her walker, and yet he did so despite his knowledge of this risk.

77.     By taking away Ms. Carmody's walker, Corporal Scofield recklessly disregarded the obvious and substantial risk of serious harm to Ms. Carmody that he created by doing so.  By recklessly disregarding this substantial risk of serious harm to Ms. Carmody, Corporal Scofield acted with deliberate indifference to her constitutional right, as a pretrial detainee, to adequate medical care, a right secured by the Due Process Clause of the Fourteenth Amendment.

78.     Existing law at the time of Ms. Carmody's detention clearly established that a jail official's deliberate indifference to a pretrial detainee's known, serious medical needs violates the Due Process Clause of the Fourteenth Amendment. Corporal Scofield knew or reasonably should have known that his actions, taken within the scope of his official duties and employment, violated this clearly established constitutional right.

79.     Sheriff Ensminger was responsible for overseeing, training, and supervising Undersheriff Bishop, Corporal Scofield, and all other staff at the Jail at the time of Ms. Carmody's detention. Sheriff Ensminger was in charge of the overall management of the Jail, setting Jail policy and practices, and ensuring the health and safety of all persons detained at the Jail.

80.     Upon information and belief, Undersheriff Bishop was responsible for the day-to-day oversight and supervision of the Jail and Jail officials and inmates.

81.     Upon information and belief, under the CCS Defendants' contract with Teller County, the CCS Defendants were responsible for the policies, practices, and customs—including training and supervision—of Jail officials, including individual Defendants, with respect to the provision of medical care and treatment to inmates with serious medical needs.

82.     Upon information and belief, Sheriff Ensminger, Undersheriff Bishop, and the CCS Defendants (1) promulgated, created, implemented, or possessed responsibility for the persistent and widespread practice of Jail officials and staff's failure to provide adequate care to meet the serious medical needs of inmates and/or (2) made a deliberate choice to not adequately train Jail officials and staff in meeting the serious medical needs of inmates when, given the Sheriff's Office history of failing to provide or withholding from inmates needed medical care, these Defendants knew of the need to provide additional or better training in this respect.

83.     Sheriff Ensminger, Undersheriff Bishop, and the CCS Defendants thus knew that their acts or omissions were substantially certain to cause Jail officials to violate inmates' constitutional rights to receive adequate medical care, and they consciously or deliberately chose to disregard this risk of harm in adhering to their custom of failing to provide adequate medical care and/or in deliberately choosing not to provide additional or better training to Jail officials in providing adequate medical care.

84.     Therefore, Sheriff Ensminger, Undersheriff Bishop, and the CCS Defendants set in motion a series of events that they knew would cause an inmate in a similar situation as Ms. Carmody to be deprived of the constitutional right to receive adequate medical care in jail. But for the above acts or omissions of Sheriff Ensminger, Undersheriff Bishop, and the CCS Defendants, Ms. Carmody would not have been subjected, in the form of her walker being taken away, to a violation of her constitutional right to receive adequate medical care, and such a

deprivation was a natural and foreseeable consequence of these acts and omissions.

85.     Accordingly, as the moving force behind the violation of Ms. Carmody's constitutional rights, Sheriff Ensminger, Undersheriff Bishop, and the CCS Defendants were deliberately indifferent to Ms. Carmody's constitutional right, as a pretrial detainee, to receive adequate medical care.

86.     Sheriff Ensminger and Undersheriff Bishop knew or reasonably should have known that their acts and/or omissions would violate the clearly established constitutional rights of an individual like Ms. Carmody.

87.     Ms. Carmody's back injury and related handicap and pain, as well as her associated damages—which include past and future medical expenses, pain and suffering, emotional distress, and impairment of quality of life—were caused by Corporal Scofield's, Sheriff Ensminger's, Undersheriff Bishop's, and the CCS Defendants' deliberate indifference to her serious medical needs.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation –**
**Deliberate Indifference to Serious Medical Needs (Treatment after Fall)**
**(Against the CCS Defendants, and Sheriff Ensminger, Undersheriff Bishop, Deputy**
**Eric Voigt, and Sue L/N/U in their individual capacities)**

88.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

89.     On or about October 27, 2014, Ms. Carmody was a pretrial detainee for purposes of the Due Process Clause.

90.     On or about October 27, Ms. Carmody had an obvious and serious medical need after she had fallen. Due to her initial inability to move and her severe pain, even a lay person would have easily recognized the necessity for medical examination and treatment.

91.     Failure to examine or treat Ms. Carmody's back injury posed a substantial risk of serious harm because it was highly probable that a delay in, or complete lack of, adequate medical care would cause Ms. Carmody to experience substantial pain while waiting for treatment and/or cause damage to her back that immediate medical attention may have prevented or reduced.

92.     The harm actually suffered by Ms. Carmody due to Jail officials and staff's failure to examine or treat her back injury was substantial because she suffered extreme pain for the approximately ten days she remained in jail without adequate treatment, and the present damage to her back could have been less severe had she received immediate medical attention.

93.     Deputy Voigt and Nurse Sue knew of Ms. Carmody's serious medical needs after she fell because she told them she needed an ambulance, she could not move, and she had shooting pains in her back; accordingly, they were presented with obvious and recognizable symptoms which potentially created a medical emergency.

94.     Despite their awareness of Ms. Carmody's serious medical needs, Deputy Voigt and Nurse Sue completely denied Ms. Carmody any care or treatment in reckless disregard of the obvious and substantial risk of serious harm posed by such acts and omissions.

95.     By recklessly disregarding a substantial risk of serious harm to Ms. Carmody, Deputy Voigt and Nurse Sue acted with deliberate indifference to Ms. Carmody's constitutional right to receive adequate medical care.

96.     In light of existing law, Deputy Voigt knew or reasonably should have known that his actions violated Ms. Carmody's clearly established constitutional rights.

97.     But for the custom of deliberate indifference to inmates' serious medical needs that was established by Sheriff Ensminger, Undersheriff Bishop, and the CCS Defendants and/or

their failure to adequately train Jail officials in meeting the serious medical needs of inmates, Ms. Carmody would not have been subjected, in the form of a failure to provide her adequate medical attention after she fell, to a deprivation of her constitutional rights. This deprivation was a natural and foreseeable consequence of Sheriff Ensminger's, Undersheriff Bishop's, and the CCS Defendants' acts and omissions.

98.     Accordingly, as the moving force behind the violation of Ms. Carmody's constitutional rights, Sheriff Ensminger, Undersheriff Bishop, and the CCS Defendants were deliberately indifferent to Ms. Carmody's constitutional right to receive adequate medical care.

99.     Sheriff Ensminger and Undersheriff Bishop knew or reasonably should have known that their acts and/or omissions would violate the clearly established constitutional rights of an individual like Ms. Carmody.

100.    Ms. Carmody's severe pain while in jail and the potential exacerbation of her back injury from failure to immediately diagnosis it and adequately treat it, as well as the associated damages—which include past and future medical expenses, pain and suffering, emotional distress, and impairment of quality of life—were caused by Deputy Voigt's, Nurse Sue's, Sheriff Ensminger's, Undersheriff Bishop's, and the CCS Defendants' deliberate indifference to Ms. Carmody's serious medical needs.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation –**
**Deliberate Indifference to Serious Medical Needs**
**(Against Sheriff Ensminger in his official capacity)**

101.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth therein.

102.    At all times relevant to the subject matter of this Complaint, Sheriff Ensminger, as

the elected sheriff of Teller County, was an agent of the Sheriff's Office and Teller County.

103.    At all relevant times, Teller County and its agent the Sheriff's Office had a non-delegable duty to provide constitutionally adequate medical care for inmates.

104.    As described above, at the time of Ms. Carmody's detention, there had been repeated instances of Jail officials and staff not providing, or consciously withholding, needed medications or medical care for inmates with serious medical needs. These violations by Jail officials of inmates' constitutional rights to receive adequate medical care were so widespread and flagrant that in the proper exercise of its official responsibilities, Teller County, through its agent the Sheriff's Office, must have known of them.

105.    Despite this obvious pattern of Jail officials and staff failing to meet inmates' serious medical needs, Teller County, through its agent the Sheriff's Office, deliberately chose not to provide additional or better training in recognizing inmates' serious medical needs and providing appropriate care to meet such needs.

106.    Jail officials' unconstitutional practice of failing to provide adequate care to meet inmates' serious medical needs was so persistent and widespread so as to constitute a custom properly attributable to Teller County through its agent the Sheriff's Office.

107.    Although Teller County, through its agent the Sheriff's Office, knew that its failure to adequately train and supervise Jail officials in meeting the serious medical needs of inmates and/or its custom of not providing adequate medical care were substantially certain to result in a constitutional violation like that suffered by Ms. Carmody, Teller County, through its agent the Sheriff's Office, consciously and deliberately chose to disregard this obvious risk of harm.

108.    Teller County's, through its agent the Sheriff's Office, conscious and deliberate

adherence to such inadequate training and/or custom, with deliberate indifference to the known or obvious risk of substantial harm that was created by doing so, was the moving force behind the individual Defendants' violations of Ms. Carmody's constitutional rights to receive adequate medical care from Jail officials. But for the adherence to such inadequate training and/or custom, Ms. Carmody's constitutional rights would not have been violated twice, and the natural and probable consequence of such inadequate training and/or custom was a constitutional violation like those suffered by Ms. Carmody.

109.    The unconstitutional customs and practices of the Teller County, through its agent the Sheriff's Office, were the moving force and proximate cause of the deprivation of Ms. Carmody's constitutional right to receive adequate medical care while detained at the Jail, and caused Ms. Carmody other damages as well.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 12131 *et seq.***
**Violation of Title II of the Americans with Disabilities Act of 1990, as Amended –**
**Unlawful Discrimination and Failure to Reasonably Accommodate**
**(Against Sheriff Ensminger in his Official Capacity)**

110.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

111.    The Jail is a public entity within the meaning of Title II of the ADA.

112.    When Ms. Carmody was detained at the Jail from October 23 to approximately November 5, 2014, she had a disability. Because of her hip replacement surgery, she had a physical impairment that substantially limited her ability to walk, an activity that is considered a major life activity for purposes of the ADA.

113.    Ms. Carmody was a qualified individual with a disability within the meaning of Title II of the ADA because at all relevant times, she met the essential eligibility requirements

for the receipt of services provided by, or the participation in programs or activities at, the Jail.

114.    Because Ms. Carmody's physical impairment—her inability to walk without the aid of her walker—was obvious, Teller County, through its agent the Sheriff's Office, had knowledge of her disability.

115.    Permitting inmates at the Jail to move about the facility—for example, from their cells to the cafeteria or dayroom—within the limits set by Jail officials for the general Jail population was an aid, benefit, or service that was afforded to the inmates at the Jail. In taking away Ms. Carmody's walker, Teller County, through its agent the Sheriff's Office, denied her the opportunity to participate in or benefit from that aid, benefit, or service on an equal basis as those without a disability.

116.    Teller County, through its agent the Sheriff's Office, had knowledge that for Ms. Carmody to have meaningful access to its programs and services, including but not limited to moving about the facility, she needed a reasonable modification to the Jail's rules, policies, or practices. Teller County, through its agent the Sheriff's Office, had such knowledge because Ms. Carmody's need for an auxiliary aid such as her walker was obvious and/or Ms. Carmody had requested to keep her walker while in Jail.

117.    Allowing Ms. Carmody to keep her walker while in Jail was a reasonable modification to the Jail's rules, policies, or practices.

118.    Thus, by taking away her walker and/or by not offering her any alternate auxiliary aid, Teller County, through its agent the Sheriff's Office, denied Ms. Carmody a reasonable modification. Teller County, through its agent the Sheriff's Office, thereby excluded Ms. Carmody from participation in or denied her the benefits of the Jail's services, programs, or activities because of her disability and/or discriminated against Ms. Carmody because of her

disability.

119.    Teller County's, through its agent the Sheriff's Office, above acts or omissions were taken with deliberate indifference to the strong likelihood that doing so would likely result in a violation of the ADA or its implementing regulations.

120.    The violation by Teller County, through its agent the Sheriff's Office, of Title II of the ADA caused Ms. Carmody's back injury and associated damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and grant:

(a)    Appropriate relief at law and equity;

(b)    Declaratory relief and other appropriate equitable relief;

(c)    Economic losses on all claims allowed by law;

(d)    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e)    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f)    Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g)    Pre- and post-judgment interest at the highest lawful rate;

(h)    Any further relief that this Court deems just and proper, and any other relief as allowed by law.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Dated this 19th day of October, 2016.

KILLMER, LANE & NEWMAN, LLP

_s/ Liana Orshan_
David A. Lane
Liana Orshan
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
(303) 571-1001 - fax
dlane@kln-law.com
lorshan@kln-law.com